IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 13, 2011 Session

# IN RE: THE ADOPTION OF DESTINY R. D.

**Appeal from the Chancery Court for Maury County**
**No. A03710      Stella L. Hargrove, Judge**

---

**No. M2011-01153-COA-R3-PT - Filed March 27, 2012**

---

The mother and stepfather of a three year old girl filed a petition to terminate the parental rights of the child's father on the ground of abandonment so that the stepfather could adopt her. After hearing the proof, the trial court dismissed the petition, ruling that the petitioners had not met their burden of proving by clear and convincing evidence that the father's failure to visit the child or his failure to provide child support in the four months preceding the filing of the petition were willful. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Leonard Robert Grefseng, Columbia, Tennessee, for the appellants, J. A. D. and L. N. D.

Ronald G. Freemon, Columbia, Tennessee, for the appellee, D. S. V.

## OPINION

### I. BACKGROUND

The child at the center of this case, Destiny R.D., was born out of wedlock in Columbia, Tennessee in March of 2007. The child's parents, L.N.D. ("Mother"), and D.S.V. ("Father") lived together for about a year and a half. At the time of the child's birth, they were living in a trailer owned by Father's parents. Mother left Father when the child was about five months old and moved into her parents' home. She testified that the reason for the move was that Father was not taking adequate care of the child while Mother was at work (Mother worked days and Father worked nights) and that the child was not thriving. At some point, Father moved out of the trailer and into his own parents' home.

It is undisputed that Father saw the child only sporadically over the next three years, and that he did not pay any child support. The proof showed that Mother refused Father's offers of support, and that she did very little to facilitate any kind of visitation between the child and Father or his family members. For example, Father's mother testified that she ran into Mother several times at a local video store. She asked Mother if "we could see the child." Mother said she would bring her over. They waited and waited, but it never happened. She also testified that Mother's mother refused to allow Father's parents to be present at any of the child's birthday parties. The proof showed that Mother's mother did not like Father or his family and that she tried to deter Father from establishing or maintaining any kind of relationship with his child.

Mother left her parents' home in October of 2008, to move in with J.A.D. ("Stepfather"). They married on September 4, 2010. Shortly thereafter, on October 5, 2010, Mother[1] and Stepfather filed a petition in the Chancery Court of Maury County to terminate Father's parental rights and for adoption. The grounds alleged were abandonment by reason of failure to visit and failure to provide support. Father filed an affidavit of indigency, and the trial court appointed an attorney to represent his interests.

## II. THE HEARING ON THE TERMINATION PETITION

The hearing on the petition was conducted on March 2, 2011. Mother, Father and Stepfather all testified, as did Father's mother and father. Mother testified that she had never received a penny of child support from Father. She acknowledged, however, that she did not want him to pay any child support. She stated that Father " . . . verbally told me that he would provide whatever I needed for my daughter – our daughter. He would provide – I would call him up – to call him up if I ever needed diapers or whatever." Mother never called "because I had a good job to provide my daughter with that stuff." Father testified that he had offered support more than once, and that Mother never took him up on the offer. Father's mother and father also confirmed Father's offers and Mother's refusal.

---

[1]Although Mother has no standing to bring a petition to terminate parental rights, she is a necessary party to a petition for adoption by her husband. Because the statute governing parties who can petition for termination of parental rights, Tenn. Code Ann. § 36–1–113(b), does not include a biological parent as a potential petitioner, Mother had no standing to pursue termination of Father's parental rights. *Osborn v. Marr*, 127 S.W.3d 739–40. Tenn. Code Ann. § 36-5-115(c) provides "that if the spouse of the petitioner is a legal or biological parent of the child to be adopted, such spouse shall sign the petition as co-petitioner."

Mother also testified that her mother and Father's mother did not get along.[2] She attributed the difficulties between them to a threat Father's mother allegedly made to her mother at the hospital when she was giving birth. She testified that she did not hear the threat and did not know what it was about. She insisted, however, that her mother had nothing against Father and that she had told him that he could come to her house at any time to see the child. Father's mother testified, however, that on one occasion she heard Mother's mother on speaker phone telling Father "Do not come over here or we will call the police."

The record in this case includes testimony and exhibits related to inconclusive proceedings between the child's parents that took place in the Juvenile Court of Maury County prior to the proceedings in Chancery Court that gave rise to this appeal. Although they had no legal effect on the chancery court proceedings, they provide some context for the issues under consideration. One of those documents is a proposed permanent parenting plan submitted by Mother's attorney on March 13, 2008. The plan provided that Mother was to be the child's primary residential parent, and Father was to exercise supervised visitation every Sunday from 2:00 p.m. to 6:00 p.m.[3]

Under the "special provisions" section of the plan was a statement that "The child shall not be in the presence of [Father's parents]. If Father has to work past 1:00 a.m. on Sunday before his visitation, Father shall notify Mother so that Mother can take child to daycare." In a letter attached to the parenting plan, Mother's attorney informed the Juvenile Court that Mother wanted the child to be kept away from the paternal grandparents because of their admitted past use of marijuana. Mother testified that Father's mother was arrested for using marijuana before Mother and Father started dating. Mother acknowledged under questioning that she did not know whether Father's mother still smoked marijuana.

Mother thus apparently anticipated that Father's visitation would take place in the home of her own parents, where she was still living at the time the proposed parenting plan was submitted. The proof indicated, however, that Mother's mother did not want to allow Father in her house. The attorney's letter also stated that Mother would not object if the court reserved the issue of child support. The plan itself declared that child support was "to be determined." The copy of the plan in the record is not signed by either party or by the

_____

[2]Mother testified that her biological mother lived in Texas. The woman she referred to as her mother during trial (and who we also refer to as Mother's mother) was actually her stepmother, who had never legally adopted her.

[3]There was testimony in the record that Father and Mother had earlier collaborated on a proposed parenting plan that gave Father more extensive visitation with Destiny, but that Mother's mother did not approve of that plan, and that she forced Mother to "do away with it," and to submit instead the plan that is found in the record.

judge. According to the parties, the juvenile court judge signed the plan on December 9, 2009, but for reasons that are unclear from this record, neither party received a copy of the signed plan. Thus, Father was never informed that the court had granted him any visitation rights, however limited.

Mother had filed an application for TennCare benefits on behalf of the child at some point, which led the Maury County District Attorney to file a petition for child support against Father. Father was not served with the petition until September 30, 2010, just five days before the filing of the petition to terminate his parental rights. There was therefore no adjudication of his child support obligation prior to the termination proceedings, and the District Attorney's petition appears to be the first demand for child support made to Father.

The proof showed that Father was thirty-five years old at the time of trial and that he had worked throughout his entire adult life. He held a job at a McDonald's restaurant and had worked there continuously for eleven years, except for a four month interval when the restaurant laid him off. He has two older daughters from earlier relationships. His ten-year old daughter lives in his parents' house with him, and he shares legal custody of her with his mother. The child's mother pays child support to Father and his mother. Father testified that he does laundry for the child, prepares her meals, and makes sure she gets on the school bus on time. He pays his mother for rent and daycare. His other daughter is in the custody of her mother, but Father testified that he sees her every two or three weeks.

The testimony of Father and his parents indicates that the reason he has to share custody of the ten year old is because of his mental limitations. Father testified that he has been diagnosed with a cyst on the right side of his brain. He denied that it interfered with his mental capacity or his ability to understand things, but he acknowledged that he sometimes has memory problems that make it hard for him to recall dates or time or people.

A small demonstration of Father's limitations occurred during his testimony, when he was asked how long it had been since he saw the child whose parenting is at issue in this case. He answered "about five years." Of course, Destiny had just turned four at the time of trial and Father had seen her a few times after he and Mother separated, including within the previous eighteen months. Father's father testified that when Father was adopted, he and his wife had him tested, which led to the discovery of a tumor in his brain. Surgery was not recommended because the tumor did not appear to be growing. Father's father confirmed that Father had difficulty understanding the passage of time, did not comprehend how long a month was, and could not plan more than a week ahead at most. He thus found it difficult to set priorities.

Father's non-confrontational personality is perhaps equally relevant to our

understanding of his interactions with Mother and her family as are any specific limitations. He testified, for example, that when Mother was living with her mother, he would call to arrange visitation with Destiny, but that he was only able to visit the child once or twice. He denied that Mother had rejected his attempts to arrange visitation, but he declined to criticize Mother's mother, who was apparently the one he usually spoke to.[4] He admitted that he did not know whether Mother's mother passed his requests for visitation on to Mother. The following excerpt from Father's testimony should convey some idea of the strangeness of the whole situation and Father's passive response to it:

Q. Did [Mother's mother] ever threaten you?

A. No, sir.

Q. Did she ever tell you weren't welcome over there?

A. On the phone she did when she was mad at me, yes.

Q. When she was mad at you?

A. Yes.

Q. What was she mad at you about?

A. Not seeing Destiny.

Q. And how did that conversation go?

A. It went well.

Father's father also testified that Father frequently expressed the wish to see Destiny, and that he and his wife had urged Father to take legal action to secure his visitation rights. Father refused, however, saying that he and Mother had an agreement that neither one would take the other to court. Father's father explained that Father always tried to please or appease others and was reluctant to stand up for his rights. He also described Father as someone who

---

[4]According to Father's mother, Mother did bring the child to Father's parents' house for visitation several times during that period: "She had to do it behind [her mother]'s back. So she would tell us not to tell [her mother] that she was over there." Father's father testified that Mother came to their house for visits with the child from time to time until September of 2009. He confirmed his wife's testimony that Mother told Father that her mother did not want Father over at her house.

was easily persuaded by others to do things that were not in his best interest, and he recounted an incident in which some of Father's friends had tricked him into hauling water during a drought from a source that they knew he had no right to access, resulting in Father's arrest.

Father was asked if he called Mother after she moved out of her parents' home. He said he did not, because he did not know the last name of Mother's husband-to-be, and thus could not find the phone number. The proof showed that Mother's cell phone number did not change after she moved out of her parents' home. However, her cell phone service was cut off after she lost her job in 2009, and it was still inactive at the time of trial. In any case, Mother testified about one phone conversation with Father that occurred after she moved in with Stepfather. Father called her parents' home in November of 2009, and asked to speak to Mother. As it happened, she was there because her grandmother had passed away two days earlier, and the funeral had just concluded. Father asked Mother if she could bring the child to McDonald's to see him. Mother responded that it was not a good time, because of the funeral. She did not offer any alternative time, and he did not ask for any other alternative.

Father, Mother and Stepfather all went to the same church. So Father did get to see Destiny on Sundays when she was in daycare at the church. But something happened in January of 2010 to close that window for visitation. The trial court found that "visitation was stopped after [Mother] requested the minister of the church to intervene." But the affidavit of a Sunday School teacher that was attached to Mother's subsequently-filed motion to alter or amend stated that the teacher knew of no actions by Mother or Stepfather that would support that idea. The teacher stated that on two occasions Father came in during the middle of his class for one to two year old children, and that in the teacher's opinion this caused a disturbance in the lesson he was attempting to teach. The teacher denied that he told Father that he could not visit with the child, but only that he should not come in during class.

Mother was questioned about the child's relationship with Stepfather. She testified that he was the only father that the child had ever known, and that there was a strong and loving bond between them. She denied that she had ever tried to get the child to call Stepfather "Daddy," but that the child began doing so spontaneously, and Mother thought it would not be helpful to correct her. When Stepfather took the stand, he testified that he considered the child to be his daughter, and he denied that there was any animosity or ill-will between himself and Father.

After hearing all the testimony, the trial court took the matter under advisement. On March 29, 2011, the court filed an order that summarized the trial testimony and contained findings of facts and conclusions of law. The court acknowledged that Father had failed to

energetically assert his visitation rights, but noted that he had to contend with the hostility of Mother's mother as well as with his own mental limitations. The court's order stated, "[t]he Court is concerned about the mental capacity of [Father] and his ability to set up visitation rights with the child, and to follow through on a routine basis without assistance or guidance," and further that "[t]he Court is concerned that [Father] has never had a chance to prove himself in his relationship with the child and finds that he needs a chance to work with [Mother] outside of interference with the other side."

The order also stated the court believed the testimony of Father's father about the conduct of Mother's mother. The court noted that Mother's mother had failed to testify, and declared that "[t]he Court feels she was an absent material witness." The court concluded that the petitioners failed to meet the heightened burden of proof that is required to terminate parental rights, and it denied the petition to terminate. Mother and Stepfather subsequently filed a motion to alter or amend, or in the alternative for new trial, which the trial court also denied. This appeal followed.

### III. STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

This appeal involves one of the most serious decisions courts make. "Few consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The state may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 308 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct.

App. 1998).

Persons seeking to terminate another's parental rights must prove two things. Tennessee Code Annotated § 36–1–113(c) requires that termination of parental rights must be based upon: (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental rights have been established; and (2) that termination of the parent's rights is in the best interests of the child.

Both grounds and best interests must be proved by clear and convincing evidence. *In re Angela E.*, 308 S.W.3d at 250 ; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *Santosky*, 455 U.S. at 769, and its purpose is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Bernard T.*, 319 S.W.3d at 586, 596 (Tenn. 2010); *In re Angela E.*, 303 S.W.3d 240; *In re M.W.A.*, 980 S.W.2d at 622.

> Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App.2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App.2008).

*In re Bernard T.*, 319 S.W.3d at 596.

In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

The party seeking termination must establish the existence of only one statutory ground to support a termination. *In re Angela E.*, 303 S.W.3d at 251; *In re Valentine*, 79 S.W.3d at 546. Only if at least one ground is established by clear and convincing evidence does the trial court or the reviewing court conduct a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. As we have stated before, existence of a ground does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child. *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

Appellate courts review the trial court's findings of fact in termination proceedings using the standard of review in Tenn. R.App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Thus, reviewing courts will review the trial court's findings of fact *de novo* on the record and accord these these findings a presumption of correctness unless the evidence preponderates otherwise. *In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn.2007).

In light of the heightened burden of proof in termination proceedings, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements necessary to terminate a parent's rights. *In re Bernard T.*, 319 S.W.3d at 597. A reviewing court must review "the trial court's ruling that the facts of [a] case sufficiently support the termination ground. . . ," a conclusion of law, *de novo* with no presumption of correctness. *In the Matter of M.L.P.*, 281 S.W.3d at 393 (quoting *In re A.M.H.*, 215 S.W.3d at 810).

## IV. ABANDONMENT

Mother and Stepfather alleged one statutory ground for termination of Father's parental rights - that he had abandoned his child. Abandonment has very specific statutory definitions, and the provision relevant herein defines abandonment as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments towards the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i).

In the present case, it is undisputed that Father failed to provide support or to visit the child during the relevant four month period. However, to establish abandonment, the failure to support or to visit must have been willful. *In re Swanson,* 2 S.W.3d 180 (Tenn. 1999); *Menard v. Meeks,* 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000).

The willfulness of a parent's conduct depends upon the person's intent, and such intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Thus, intent must often be inferred from circumstantial evidence drawn from the parent's actions or conduct. *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008). A

person's demeanor and credibility as a witness also play an important role in determining intent, and trial courts are accordingly in the best position to make such determinations. *In re D.L.B.*, 118 S.W.3d at 360, 367 (Tenn. 2003); *In re Z.C.G.*, M2000-02939-COA-R3-CV, 2001 WL 1262609 at *6 (Tenn. Ct. App. Oct. 22, 2001).

### A. Failure to Support

Generally, a person's failure to support a child is willful when that person is "aware of his or her duty of support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing support." *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005). The evidence in the present case showed that Father offered child support to Mother more than once and that she always refused. There are no indications in the record to suggest that Father's offer was insincere or that he would not have paid support if Mother had accepted his offer. Mother stated she turned down Father's offers because she could provide what was necessary for her daughter.

A failure to pay child support is generally not considered willful if support has been offered and refused. *Menard v. Meeks,* 29 S.W.3d at 874; *In re Adoption of W.J.P.,* E2007-01043-COA-R3-PT, 2008 WL 246015 (Tenn. Ct. App. Jan. 30, 2008) (no Tenn. R. App. P. 11 application filed); *In re A.J.H.*, M2002-01568-COA-R3-JV, 2003 WL 1129817 at *3 (Tenn. Ct. App. Mar. 14, 2003) (no Tenn. R. App. P. 11 application filed).

It was Mother and Stepfather's burden to prove, by clear and convincing evidence, that Father willfully failed to support the child. Our review of the evidence confirms the trial court's implicit conclusion that they failed to carry their burden.

### B. Failure to Visit

With regard to visitation, the evidence suggested that Mother's conduct, and that of her mother even more so, were calculated to discourage Father from exercising visitation. The evidence also showed that Father tended to avoid confrontation and did not want to "make waves." The trial court itself noted that Father was easily discouraged when faced with obstacles.[5]

---

[5]We note that in the case of *In re F.R.R., III*, 193 S.W.3d 528 (Tenn. 2006), our Supreme Court affirmed this court's finding that the father had abandoned his child by failing to visit in the four months prior to the filing of the petition for termination, even though the father had testified that his reasons were

(continued...)

Mother acknowledges that when a parent attempts to visit his child but is "thwarted by the acts of others," the failure to visit is not willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In Re D.A.H.*, 142 S.W.3d 267, 277 (Tenn. 2004). She points out, however, that "a parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citing *In re Audrey S.*, 182 S.W.3d at 864). She denies that anything she or her mother did significantly interfered with Father's ability to visit his child.

As a corollary to that denial, Mother argues that the trial court erred by giving Father's mental limitations any weight in its decision. First, she notes that Father has never been adjudged incompetent, and that he has shown himself capable of holding down a job and taking care of his older daughter. She concludes that Father's failure to visit was his conscious and deliberate choice, and thus has to be considered willful. The evidence suggests, however, that Father very much wished to enjoy visitation with his child, but that despite his ability to function normally in some areas of life, the actions of Mother and her mother significantly constrained his opportunities for visitation, in light of his specific limitations, as described by his father, and his non-confrontational nature.

The trial court examined the question of Father's willfulness or lack thereof within the context of the totality of the circumstances of this case. Those circumstances include numerous acts and omissions by Mother and by Mother's mother that had the effect of limiting or discouraging contact between Father and his child.

Mother also argues that there was no evidence that any specific actions taken by herself or anyone else during the four months prior to the filing of the petition for termination of parental rights prevented Father from having contact with the child. She asserts that any prior obstacles to visitation could not excuse Father's failure to visit during the relevant time period, thereby obligating us to conclude that Father's failure to visit was willful. We find this argument unpersuasive. Mother would have us construe the abandonment statute too narrowly by trying to limit the scope of the trial court's effort to understand parental intention.

Virtually all termination cases involving abandonment include consideration of events

---

[5](...continued)
that he did not want to be a "trouble maker" or to "disrupt their lives." But in that case, unlike in the present one, the father did not assert that the child's mother or stepfather or anyone else did anything to prevent him from visiting. *In re F.R.R., III*, 193 S.W.3d at 530.

that occurred prior to the critical four month period, because those events illuminate the motivations of the parties and the situations they find themselves in during that period. In the present case, Father and his parents were consistently thwarted in their efforts to see the child over a period of years, which had the effect of deterring them from making additional efforts. No gestures were made by Mother or by Mother's mother prior to the service on Father of the petition to terminate his parental rights to indicate that their attitudes towards Father had changed. Father therefore had little opportunity to ask for visitation, and little reason to believe that if asked for, it would be allowed.

Due to the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d at 188. The trial court herein was called upon to determine, among other things, the willfulness of Father's failures or inactions. A witness's demeanor and credibility play an especially important role in determining matters of willfulness or intent. *In re Adoption of T.A.M.*, M2003-02247-COA-R3-PT, 2004 WL 1085228 at *4 (Tenn. Ct. App. May 12, 2004) (no Tenn. R. App. P. 11 application filed) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)).

Trial courts are able to observe witnesses as they testify, to assess their demeanor, and to evaluate their credibility. *In re M.A.R.,* 183 S.W.3d 652, 661 (Tenn. Ct. App. 2005). The trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide the issues that depend upon such testimony. *In re Arteria H.*, 326 S.W.3d 167, 176 (Tenn. Ct. App. 2010); *In re Adoption of W.J.P.,* 2008 WL 246015 at *9.

We have reviewed the record, and our review supports the trial court's conclusion that Mother and Stepfather failed to provide proof that eliminated any serious or substantial doubt about whether Father's failure to visit was willful.

**IV.**

Accordingly, we affirm the trial court, and we direct the court, upon Father's application, to fashion a visitation schedule that would enable Destiny to become reacquainted with Father.

The order of the trial court is affirmed. We remand this case to the Chancery Court of Maury County for further proceedings. Tax the costs on appeal to the appellants, J. A. D.

-12-

and L. N. D.

_____
PATRICIA J. COTTRELL, JUDGE